[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a neglect petition concerning Eric A., a minor child born to respondent mother, Vicky A., on October 18, 1989. The petition was filed on December 23, 1998, along with a motion for an order of temporary custody, which was granted. Eric's putative father, one Robert H., is whereabouts unknown and was duly notified pursuant to an order for publication. Robert H., who has had little involvement in Eric's life, has been defaulted for failure to appear. Vicky A. appeared through counsel and requested a trial, which was held on four days, October 8, December 7, December 10, and December 20, 1999. Both DCF and Vicky A. called a number of witnesses and submitted documentary evidence. Eric's attorney and guardian-ad-litem called no witnesses and submitted no evidence.
The credible and relevant evidence submitted during trial reveal the following facts:
On December 19, 1998, members of the Hartford Police Department, along with members of the Mobile Crisis Unit and the Capitol Region Mental Health Center Crisis Team, were dispatched to the apartment of the respondent mother, Vicky A. For several days, Vicky had been contacting the police department in a manner that had caused police personnel to become concerned as to her emotional stability. She made repeated calls on December 16, December 18 and December 19. Vicky claims she was calling because her older son, Terris needed help; however, at one point, on December 17, a person who identified himself as Terris got on the line and informed the police that Vicky, not he, needed the help. Terris was not in her apartment when the police arrived on December 19. Vicky refused to let anyone in. She was, according to those present, "rambling", and speaking of babies crying outside and people shooting into or breaking into her apartment. After persuading her to open the door, the police had to restrain Vicky when she picked up a knife in a threatening manner.
According to Dr. Peter Strong, a psychiatrist present at the scene to evaluate Vicky, she was, on this date, "delusional," "gravely disabled" and in the throes of a "manic decompensation." She was unable to care for herself or Eric, and Strong determined she needed emergency hospitalization. Vicky was taken to be evaluated at the Hartford Hospital emergency room, where she was agitated and unable to cooperate. Vicky had been prescribed psychotropic medication, but her levels were below recommended therapeutic standards. That same evening, she was admitted to CT Page 16720 Elmcrest Hospital.
Prior to the incident on December 19, two earlier episodes that occurred that week led to referrals being made to DCF due to concerns for Vicky's mental status and her ability to properly care for Eric. Although Vicky objects to the court's considering all the events of that week as a factual basis for adjudication, and the incident which occurred on December 19, in and of itself, is sufficient to prove the allegations of neglect, the petition alleges that mother failed to take her medication and required a hospitalization on December 19. The events that occurred in the several days before that point are relevant and probative of the fact that Vicky did experience a mental breakdown, as well as supportive of the police department's decision to summon crisis workers to the family home on December 19.
Earlier that week, Eric had left his elementary school when his teacher advised him she was going to have to call his mother about his misbehavior in the school lunchroom. Eric was missing for at several hours. He did not go home; he was found at a gas station on Albany Avenue. After this incident, Vicky took Eric to a pediatric clinic, although it is doubtful anything physically harmful had happened to him, where she demanded a battery of tests be performed on Eric. The clinic staff described her as "verbally abusive" to Eric. She would not allow anyone to talk with Eric alone. When told all the tests she demanded would not be performed, Vicky abruptly left. A report was made to DCF by a Dr. Glaser of the Pediatric Clinic on December 17 as to concerns about the status of Vicky's mental health and its affect on Eric.
West Middle school officials, after a meeting with Vicky to discuss Eric's leaving school without permission, became so concerned about her inability to engage in a rational discussion about the runaway episode. They suspended Eric and his teacher, Danielle Hodge, who considered Vicky's behavior threatening, locked her classroom door while school was in session. Concerned about the state of Vicky's mental health and its affect on Eric, the school officials also made a referral to DCF on December 17.
Once Vicky was transported to the emergency room on December 19, Officer Tracy Carter attempted to find a relative to care for Eric when Ms. Anderson had to be hospitalized, but she was not able to do so. The night of December 19, DCF instituted a 96-hour hold and Eric had to be placed in a non-relative foster home. Despite Vicky's repeated hospitalizations, there was no concrete CT Page 16721 plan in place for what should be done with Eric if she decompensated.
DCF filed a neglect petition, along with a motion for temporary custody, which was granted, on December 23. The petition and accompanying summary of facts make specific factual allegations of predictive neglect against Vicky A. The petition includes claims that Vicky failed to take her prescribed medications, became ill as a result, and was hospitalized at Elmcrest Hospital pursuant to a 15-day medical certificate on December 19, 1998. The petition alleges that due to mother's history of mental illness and the unavailability of other relatives to care for Eric, the child would be neglected if permitted to remain in her custody. The neglect allegations have not been amended, however, during the course of the trial and at closing arguments, counsel presented evidence and argued the case as if the petition alleged Eric was neglected on or before December 23.
On the basis of the above facts, the court finds by a fair preponderance of the evidence that as of the adjudicatory date, Eric A., absent the intervention of DCF on December 19, would have been a neglected child in that he would have been denied proper care and attention physically and emotionally and would have been permitted to live under conditions, associations and circumstances injurious to his emotional and physical well-being. Eric's future was uncertain; he had no suitable or reliable caretaker and, more immediately, no place to go. Vicky does not recognize the serious nature of her mental illness; she believes the lies of her family and others are the primary cause of her frequent hospitalizations. Although family members, DCF and many professionals involved with Vicky were aware of her increasing irrationality that week, the situation escalated to crisis proportions before the police intervened to protect Eric. In addition, Eric had not been prepared for the possibility that his mother might, at times, need to be taken to a hospital. His expressed view of the situation and the reason for the police presence on December 19 reflects only his mother's distorted version.
Courts have long been supportive of neglect adjudications which are, in effect, based on the prediction that the parent would neglect the child based on the parent's prior conduct or mental illness and the danger such conduct would present to a child left in her care. In re Valerie D., 223 Conn. 492,CT Page 16722613 A.2d 748 (1992); In re Kelly S., 29 Conn. App. 600, 616 A.2d 1161(1992). No court is required to leave a child in the custody of a parent who is clearly incapable of providing even basic care for the sole purpose of demonstrating that he will suffer actual harm. In re Kelly S., supra, 615. Eric's order of temporary custody was based on the belief that he was "in immediate physical danger from his surroundings, and that immediate removal from such surroundings is necessary to insure the child's safety." His mentally ill mother was hospitalized after wielding a knife in a threatening manner in the presence of several police officers. Absent judicial intervention, Eric could be the next person to bear the brunt of her unpredictable and bizarre, dangerous behavior. The determination that injury may occur as a result of perceptible danger is, in itself predictive. General Statutes § 17a-101a explicitly recognizes the state's authority to act before harm occurs, to protect the child whose health and welfare "may be" adversely affected and not just children whose welfare "has been" affected. Preventing these anticipatory measures by the judiciary, when they can be based on verifiable information from reliable sources, would undermine the public policy of this state. This court will not minimize the tragedy of December 19 by immediately returning Eric and adopting a "wait and see" attitude. None of the evidence presented assured this court that Vicky is even an adequate parent when not decompensating, or that she will not expose him to further emotional harm or physical danger in the future.
In addition, the court finds that Eric, as of December 23, 1999, the adjudicatory date, was neglected in that he was denied proper care emotionally and permitted to live under conditions, associations, and circumstances injurious to his emotional and moral well-being as a result of the events witnessed by him on the date of Vicky's hospitalization. He may have been physically sound on December 19, but there is no question that the experience of his mother's emergency and the resultant affect on him was emotionally devastating. Although there had always been a strong likelihood that Vicky would require hospitalization, Eric had not been prepared to cope with this occurrence and no one was prepared or willing to intervene, on a timely basis, to protect him.
Regrettably, after Eric's removal on December 19, 1998, several foster home and respite placements, one with a maternal relative and one with Eric's prior long term foster family, disrupted due to Eric's assaultive and aggressive behaviors. CT Page 16723 Eric, after attempts with outpatient treatment to stabilize foster placements failed, ended up in a shelter placement and eventually had to be hospitalized. He is now in a residential placement with a therapeutic component. He recently has been diagnosed with a major depressive disorder, with psychotic features and oppositional defiant disorder. According to one of his psychiatrists, Dr. Brian Keyes, Eric will require continued medication for at least the next 9 months, psychotherapy and a highly structured, therapeutic environment for at least six more months. He will need a caretaker who will not be resistant to medicating him; someone who can cooperate with his treatment and with those persons administering it. Right now, this is not Vicky. Since December of 1998, she has had three more psychiatric hospital admissions. A report filed by Officer Carter on January 4, 1999, indicates that Vicky called the police six times on that date for reasons stemming from a lost key to the whereabouts of her children. Citizen calls also came in indicating she was seen at the corner of Asylum Avenue and Sigourney Street screaming at passing cars. The police located her at the Dunkin Donuts on Farmington Avenue and transported her to the Capitol Region Mental Health center. She was hospitalized at the Institute of Living that same day. During a visit with Eric on May 3, she became upset when Eric told her he was taking his medication, and shouted at Eric to stop taking it. During another visit observed by Kate Levy, the DCF social worker, Vicky even accused Eric of pretending to need eyeglasses, although a doctor had prescribed them. The interaction observed by Dr. Sadler, described in great detail in his written evaluation, was a disaster.
Dr. Keyes noted that the impact of witnessing Vicky's December 1998 decompensation and, given her history, the likely potential for future decompensations, will significantly contribute to Eric's problems. The effects of coping with Vicky's illness will contribute to a sense that adults cannot take care of him and further impair his ability to form relationships and trust others.
This is a tragic case. Eric's July, 1997 removal from a loving foster home after 7 years, and his subsequent placement with his mother, only to be removed after 18 months, have been emotionally devastating for Eric. Services, both educational and therapeutic, afforded to Eric and Vicky after reunification were inadequate. The court is not persuaded by Vicky's argument that Eric did just fine with her until December of 1998. He exhibited behavioral problems in the second grade, which he entered CT Page 16724 immediately following his return to Vicky's care. Hodge, his third grade teacher describes Vicky as overly controlling and not allowing Eric to be more independent. She also had overly high expectations of him. If Eric missed a few questions on an assignment, Vicky made him redo the entire assignment. Vicky would also ridicule and embarrass Eric in front of other students. Hodge described Eric as shy, unsmiling, withdrawn and uncomfortable with his mother's classroom intervention. He didn't appear to have any friends. After Eric's removal from his mother's custody he attended Hodge's class for a few more days. She noticed a change in him. He was more comfortable, smiling and relaxed and he socialized more with his peers.
Vicky did, for a brief period, seek counseling for Eric. He was counseled by Bridget Jackson of Catholic Family Services, incredulously, to be independent, at the tender age of 9, in coping with his own emotional disorders and a mother with a serious mental illness. Ms. Jackson's noted that Vicky's "communication style" — regimented, not hearing what the other person has to say: painfully demonstrated by her testimony during trial — was a stressor with which Eric needed to deal independently. Who is Jackson kidding? Even when Vicky is allegedly compliant with her medications and functioning in a less delusional fashion, the result of intervention by an assertive treatment team that monitors her usage, her demeanor is rife with distorted perceptions of the world, paranoia and inappropriate anger.
No 9-year-old should be expected to cope with, and even care for, a seriously mentally ill mother in the throes of a breakdown for a period of several days without adult intervention; that is what happened to Eric. The idea that Eric could learn to predict his mother's impending breakdowns and seek help, something professionals have been unable to do, is ludicrous. Based on Eric's present state, and the continued hostility, irrationality and paranoia exhibited by his mother, which this court personally observed during her testimony, the court finds by a fair preponderance of the evidence that it is in Eric's best interest that he be committed to the care and control of the Commissioner of DCF for a period not to exceed 12 months, effective December 23, 1999 and expiring no later than December 23, 2000.
DCF, as required by statute, has filed a motion for review of a permanency plan because Eric, as of December 19, 1999, has been in placement for twelve months. A hearing on Eric's permanency CT Page 16725 plan will be held no later than February 28, 2000. Eric's attorney and his guardian-ad-litem are to see Eric and consult with his treatment providers prior that hearing to provide the court with adequate input as to a permanency plan. Counsel are ordered to contact one of the court services officers and select appropriate date(s) and time for this hearing and a case status conference prior to the hearing. At that time, this court, in determining what plan is most appropriate for Eric, intends to take judicial notice of the detailed testimony and evidence submitted during the course of this neglect trial. If the court determines that reunification can likely occur within six months of the date of the permanency hearing, the court will allow for the issuance of specific steps at that time.
KELLER, J.